May it please the court, I'm Thomas Hester from the Federal Public Defender's Office for Appellant Kevin Henderson, who spent seven years of his life in prison because he didn't buy candles, wine, and flowers, or introduce himself to Jean Hatcher's mom before having consensual sex with her. The statutory scheme under which Oregon prosecuted him is unconstitutionally vague as applied to the peculiar facts of this case. Those are facts in which the trial prosecutor maintained it would be morally untenable to say that Jean Hatcher could not consent or have sexual relationships but their ultimate position... But they eventually backed off that. They certainly said those things, and I find them interesting and intriguing. They eventually backed off and said, no, the statute would actually be violated by anybody who had sex with her, but we would then use prosecutorial discretion. She did certainly retreat from the initial offer to stipulate she can consent. Yet, and it's kind of invited by the trial judge in pages 107 and 108 of the excerpt of record are really the critical places there where the prosecutor says, you've got to draw the line somewhere. We're not going to argue that she could never ever consent to sex, that she doesn't have the right to do that. The difference we're talking about is the right to do which is a boyfriend-girlfriend type of thing. At trial, the prosecution's evidence, the prosecution's experts, say she could validly consent. The evidence before the jury is that she could validly consent, but that expert witness, and I would invite you as you review this case to look at his testimony on direct by the prosecutor at 380 and 81 of the record. He testifies... This is the prosecution's expert, the State's expert on sexual abuse, Mr. Harry Harrington. He testifies that she can validly consent, but in the context of what he describes as marital type dating behavior. He describes her familiarity with sex, which she calls sex rather than intercourse, with the mechanics of it, the man on top, but he says that to her it's just one spur of the moment thing, that there are no candles, there's no wine, there's no romance, what the rest of us would interpret should be there. And I think when you look at the prong of the vagueness doctrine that's geared toward reigning in the discretion of prosecutors, of police officers, of jurors, to determine what a statute means, it runs afoul of that in this circumstance where the State's consistent theory, although the State does retreat from its initial statement, she could consent, she could consent, to say, well, no, I guess she could never consent, but it's okay under certain circumstances. Was there substantial agreement about the level of mental acuity that she possessed? Yes. I mean, there's disagreement about what Mr. Anderson knew, but in terms of there's no dispute she's moderately mentally retarded. Well, it was more than moderately, wasn't it? The expert testimony is moderately mentally retarded. It's kind of... The question about what did he know about her mental condition was before the jury. Yes. And the jury decided that he did know. So what can we do about that? Why isn't that final? Well, first of all, I'm not really focusing on either the adequacy of the evidence or even on the affirmative defense that we're talking about now. Well, I know you're going to, and within the time limits we have, you're going to get into the vagueness issue, I guess. Yes. But was there any doubt, I guess, that you'd say that the woman was mentally defective to a substantial degree and he knew it? Yes, there certainly is doubt about that. I mean, the jury ultimately convicted him on this. There's no doubt as we're looking at the case now. I mean, because the jury did find that. So the question is really whether your vagueness argument is helpful here. I find it intriguing, interesting, and troubling. My problem is I'm not sure it's exactly a vagueness argument. That's what I'd really like to see illuminated. How does this fit into the generality of vagueness law? Okay. Well, to sort of respond, I think, to both of your questions, I think it is germane to the other prong of vagueness, which is the fair notice prong, that there was an issue about what he knew. I mean, he knew that she's in adult places. She's going to bars, places with state limits to adults. She's drinking beer and adult activities. Well, she was trolling for guys part of the time. She was, indeed, and he was. Well, it seems to me that you're spending all your time on discussion of whether or not there's institutional evidence to the jury's side of this. It seems to me that your argument is that with regard to the statute being vague and with the exclusion of evidence. It is, and I apologize if I'm being poor at fleshing that out. Let me get to the heart of the matter because we have limited time, and the issue we're concerned with, I think, is the question of the validity of the statute and of the prosecution on this case. Well, and the statute, the part of the statute that's critical is the inability to appraise the nature of the conduct, the sexual conduct. The jury rejected all the forcible charges that were here and only convicted on those charges. So what exactly are you saying is vague? Is the core of your argument that consent in this particular context is a vague concept because of the special nature of sexual activity and the civil liberties interest of the victim, the government seems unwilling and the courts would probably be unwilling to regard the consent as applicable in all circumstances. You're really saying consent is a vague word in this context? Absolutely not. Consent was found. I mean, the jury found this was consensual sexual activity. Her capacity to validly consent is what it is. But a failure to consent is the key to everything. A failure to be able to consent, right? That's right. Let me try to place it in terms of a case decided by Oregon's Court of Appeals talking about this specific statute last year, although it's well after the fact. It's the only case that you find in Oregon discussing what this means. And the Oregon Court of Appeals found this statutory scheme to be a challenge to the sufficiency of the evidence. And in that case, which is Talander, which is discussed in the state's brief and in my reply, which is 47p3 514, the Oregon Court of Appeals fleshed out the terms I was describing, incable being not able to fit or fit for doing, appraised to judge the worth or value, nature they described as the essence or essential character, and the conduct of sexual relations. So that it's her ability to judge the worth or value or the essence of the sexual relations. The government's proof, the state's expert's testimony, is that that all turns on whether there's enough romance, in our view, to make this okay. And they defer to her mother. And the prosecutor's quite specific about that. We will condone this, as with the two prior boyfriends, if her mom says it's okay. And her mom's testimony is quite intriguing in that way. Because when she describes those two prior relationships before the jury. Are we getting back into what the jury decided? It seems to me what you want to establish is the statute, the wording of the statute itself being vague. Except that this is, I'm not coming at a First Amendment challenge. I'm doing an as-applied challenge. And so I do as-applied to the facts of these cases. And it is this peculiar constellation of facts where the mother, the government's expert Why do you want to do that? I mean, why isn't the argument simply that the statute is going to have this problem? How do bullets apply to it? Because the Supreme Court has instructed and propagated to in other cases that where we don't have a First Amendment issue, you look at application of vagueness to the facts of the case. And the other case, the State case of Phelps, which is discussed in the briefing, I think is a good juxtaposition that shows a prosecution that is okay under this provision. In Phelps, the woman was profoundly autistic. She was confined in a state-run facility. The man who initiated sex with her and was convicted under the same statutory scheme was her primary attendant, who knew very well of her disability. But then you are getting back to, as Judge Huck is saying, to the evidence. I mean, he was found to know the problem. So we have to proceed on that basis, that he knew the problem. But that really isn't your problem. Your problem is that some people who knew the problem are going to be held to have violated the statute and others aren't. And that has to adhere in some notion that the language as interpreter or as likely to be interpreted is going to not give fair warning as to who is going to be violating the statute. That's your basic problem, right? As to who's – whether Mr. Anderson's conduct would fall within the statute and whether, you know, the State would prosecute it. The State certainly said, you know, we're going to kind of go with Mom's judgment about whether there's enough romance, enough contact between these people. And it is intimately – But the issue is – I mean, this is what's really interesting about the case, and which I really haven't been able to get my mind around, which is where does a vagueness challenge stop and a selective prosecution issue begin? Apparently – let's assume that you took the government's version of this, that is, the last version, which is all of this conduct violates the statute, but we're going to selectively prosecute. And then do they win? Well, I mean, that's an equal protection analysis. It is a different – it's really a fundamentally different issue. It is a similar approach to the same point, but it is not the same thing as an as-applied vagueness challenge to the statute. Here we are looking at this statutory language, which certainly the prosecutor has a lot of trouble parsing out what's applied. Another point I would – if I can go back to the calendar case I was talking about, the Oregon Court of Appeals case, on construing the statute, it deemed ambiguous. There they noted that this type of incapacity is something that is permanent, is not fluid. It changes from time to time. Yet that is what the State's evidence is with its expert and the mom saying she can consent. It is largely the position of the prosecutor. And in the as-applied focus of a vagueness challenge, that runs afoul of the Constitution. I think the Supreme Court's decision last month in Lawrence v. Texas is somewhat useful here. In that case, talking about the sodomy law in Texas, of course, which was struck down, the Court noted that it's not sort of the majority's power to enforce their own moral view of what is appropriate sexual conduct through the criminal laws. And the Supreme Court wrote, quoting Planned Parenthood, our obligation is to bind the liberty of all, not to mandate our own moral code. And that's precisely what happened here with the State's expert, the prosecutor, and ultimately the mother of this 27-year-old girl. You're not appealing on this selective prosecution or arbitrary prosecution basis. I'm not. And that might have been a, probably not a federal constitutional question on the facts of this case, but it might have been. There are several problems in this case, such as possibly entrapment by the you've already had a state conviction and a state appeal, haven't you? Yes. And you've got a jury decision that has some evidence to support it. So we can't deal with, we can't do anything about that. So what you're trying to get us to do, I guess, is write an opinion saying that this statute is void for vagueness. Now, how was it vague in this case? And I know you're out of time, but I suppose. And let me try my best to answer that. And it's something that Mr. Anderson raised in five state courts, but they never reached the merits of it. It is vague as applied to the facts of this case, because the prosecutor can't decide whether she has the capacity to dissent to, in some circumstances, consent, but not others. Ultimately, the evidence they put before the jury is she has that capacity at some stage where there's enough romance, where her mom approves, and not otherwise. So what's vague is the definition of mentally defective, or what's vague is the concept of consent. What's vague is there's no issue about there being a mental defect. But the statutory scheme defines an incapacity to consent by virtue of mental defect where the individual is incapable of appraising the nature of the sexual conduct. And in Callender's case from the Oregon Court of Appeals, they end up saying this is ambiguous, and what that ultimately means is sort of the moral quality of it. So what do they ultimately say in Callender? What does Callender ultimately say? Callender says the issue is sufficiency of the evidence. And they say they construe the statute and say the evidence was sufficient in that case. It's not a vagueness challenge. However, it frames the vagueness issue by infusing this whole moral judgment, which is, I think, what the Supreme Court was in part condemning in Lawrence v. Texas last month, into the application of a criminal statute. So what's vague is the concept of incapable of appraising the nature of the conduct? Yes. Appraising the nature of the conduct. But why isn't – I'm having – as to that, what's the conduct? The conduct is her – Sexual conduct. The sexual relations. Sexual conduct. So what she's – her sexual conduct? The sexual conduct which the jury found to be consensual or, in this case, with Mr. Anderson. Any sexual conduct, really, because in Callender, at least, the Supreme Court says that any kind of – excuse me, not the Supreme Court, the Oregon court, the federal court said, any sort of incapacity. But what I find out about the statute is that the – the rape provision actually turns on consent, right? Yet the definition of mental defective turns on the nature of the conduct. And I have a hard time understanding how those two pieces fit together. I mean, what you really want to know is what do you mean by consent by a mentally defective person? And that one never told in the statute. Well, I – the way that I understand the statute to operate, the capacity to consent doesn't exist in certain classes or circumstances. I mean, clearly, it doesn't exist with children. That's easy. But here we have a 27-year-old. They are – But the capacity – see, this is what's odd. The capacity to consent doesn't really have a lot to do with understanding the nature of one's own conduct. I mean, let's take a 17-year-old. A 17-year-old knows extremely well that if you go in to buy liquor and give money, you're going to get the liquor and then you can get drunk in it, right? I mean, that's – he has no problem assessing the nature of the conduct. Nonetheless, we've made a societal decision in certain circumstances that that individual can't buy that liquor and essentially can't consensually or otherwise. So it isn't – we make decisions about what is – what we're going to recognize as consent by certain classes of people. And I think your real argument here is that this person, that what the government seems to be saying, that she can consent, i.e., do this voluntarily sometimes and not others. And I don't see what it has to do with understanding the nature of what's happening exactly. I think I've done a poor job of explaining to you the statutory scheme. Because to take your example of alcohol by a 17-year-old, if we had another statute that said a 27-year-old woman can't buy alcohol if she has a mental defect that renders her incapable of appraising the nature of the effect the alcohol is going to have, then we would have this type of statutory scheme. And it is that confluence of terms that render the peculiar vagueness in this case. Thank you very much. We've let you go over your time substantially. We will probably still give you a minute or so in rebuttal. Thank you. It's an interesting and important case. Thank you. May it please the Court. Kathleen Segla for the Respondent, Mitch Morrell. We didn't talk about this at all in the first argument, but the first thing I would like to point out and remind the Court is our first argument on the vagueness challenge is that it was procedurally defaulted. We disagree with the Petitioner when he says that five Oregon courts were given the opportunity to review this issue. The Petitioner did not raise it at trial. He attempted to raise it on direct appeal, was told that this issue is not preserved and so we won't look at it. Attempted to raise it in post-conviction and actually phrased it as a claim. But the problem is that at the time that he supposedly defaulted, there was an Oregon court of appeals case specifically sanctioning what he had done. Well, that case was wrong. That was never the law. It was there. It was not the law, though, Your Honor. And I can, in the Petitioner's reply brief where he makes the argument that the post-conviction statute, 138, 550, sub 1, provides that notwithstanding the fact that you haven't taken an appeal that won't have any effect on post-conviction issues that may be raised, that very argument had been rejected by the Supreme Court. Yes, but in general, in general, we recognize procedural default if it's consistently applied. At the time that he was making his decision in the trial court as to what he had to raise, it was certainly not being consistently applied because the Oregon court of appeals had just held that he didn't need to do it. So how can you say this was a consistently applied procedural rule at that time? My point is, and I won't spend a lot of time on this, is that the Oregon court of appeals version of Palmer was always wrong. So it was never the law. Whether it was wrong or not, it was not just as a factual matter. As to what was going on in the Oregon courts at that time, right or wrong, it wasn't being consistently applied. Right? Well, I can tell you from my experience it was consistently applied at the trial court level. At any rate, it still, that assumes that the Petitioner chooses to not raise an issue that the consistent rule had been if you want to raise a legal issue on appeal, you have to preserve it at trial. Plus the Oregon court of appeals had a least coherent theory about what the difference was between an evidentiary rule and a challenge to a statute. It turned out to be wrong, but it wasn't off the law. Well, as a legal matter, it's our position that it was wrong. It was never the law. That North v. Cup rejected the argument that underlies both Palmer. If the same thing happened now, it would be a different situation. But at that point, it was a different. Okay. Well, that's all I want to say about procedural default. I do want to talk a little bit about calendar. I'm sure that the Court will read the case, but the issue in calendar was not a vagueness challenge to the statute. The Court did not find that the statutory scheme was ambiguous. What the Court found was that each side, well, the issue was what is the, what does it mean for the victim to be able to appraise the nature of her conduct? And the defense had one theory, which was that if she could understand the mechanics of sex, that's enough. The State's theory was, no, it's broader than that. You have to be able to, the victim has to be able to understand the consequences, the overarching circumstances, and that sort of thing. Mechanics isn't enough. So when the Court in calendar said that the statute is ambiguous, what it meant was that's a technical term in statutory construction in Oregon, that there are two equally plausible interpretations of the statute. There's no finding or holding in calendar that the statutory scheme as a whole is vague. And what calendar ended up saying is that, in fact, the State was right, that the victim has to be able to comprehend the circumstances, the consequences of the act, and not just understand this is how sex works. In that case, was the jury instructed along that line, that the victim had to know the nature and consequences of the act? I'm sure, I'm sure that, let me back up. I would assume that the jury was instructed in the language of the statute. It may not have been instructed in the same extensive terms that the calendar court came out with describing it. And I couldn't tell you for sure. I didn't review the jury instructions that closely before today. Before we run out of time, I want to ask you a couple of questions. I'm bothered by the possibility of selective prosecution in this case. This particular defendant seemed to have had an unsavory record of some kind, and maybe the district attorney wanted to get him off the street. But in this case, part of his defense was that she not only consented, but that she consented all over town and went and got a hysterectomy because she was having trouble with controlling her activity. Now, under the rape shield law, a defendant isn't supposed to raise that defense if it's rape. But this is an unusual case in many ways, because whatever happened was with consent. Whether the consent was legally viable or not is another question. But apparently most of her sexual activity was consensual. It just happened that this character, who is the defendant in this case, seemed to be a suitable candidate for prosecution. Now, in that kind of situation, why do you object to the sexual history evidence under the rape shield law to prevent him from putting in his whole defense? Well, there's a lot of points there, Your Honor, and I want to first say that, in fact, the defendant was able to put on, in the State's view, fully his defense. He was not allowed to bring in irrelevant testimony that someone told the defendant, oh, she's an easy lay. That doesn't have anything to do with the question of whether she is competent to consent. In fact, he testified about her mental condition. The trial court in this case did an excellent job, I think, in laying out the various reasons why each particular piece of evidence is relevant and may not be. And we have a split of things that various pieces are relevant to. We have the question of what was the victim's mental condition? Is she mentally competent to consent? And as the court pointed out, there's all kinds of evidence that has nothing to do with sex that you could present on that issue. Does she work? Did she go to school successfully? Did she, you know, things that have nothing to do with sex. Does she live by herself, which this victim did not? All of those things could go to her ability. What's interesting and difficult about this case is that we have tended, particularly in recent years as a society, to treat sexual issues as special with regard to consent in many directions. One of the abortion child consent cases are an example. In that instance, children who usually can consent are considered to be able to have their own autonomy, interests, and sexuality when they don't as to other things. So we don't tend to amalgamate decisions, sexual decisions, to other decisions with regard to consent. You're looking at me. But I think that's true if you think about it. We tend to regard, because there's a constitutional liberty interest in sex and perhaps because we regard it as being both fundamental and a right to reproduce otherwise, we tend to take a different view, I think. And that's why the prosecutor, I don't know if he was a prosecutor at the trial, really got into this confusion in trying to sort of balance both sides and be thoughtful about the problem. But that's what I was going to say, Your Honor, is that I think that entire discussion that the Petitioner relies on, it isn't being made in the context of whether the statute is vague, whether he should be prosecuted, whether they should be prosecuted, whether she can even really, whether she can legally consent. Well, yes, because it's recognizing that consent to sex with regard to mentally retarded people is something as to which there has been a lot of thought given in recent years and there is some notion afloat which the government was largely buying into, that there has to be perhaps a lower standard of what's consensual or what's voluntary than you might have otherwise. That's why the case is a hard and interesting case. Well, and that's, if I can loop back again to the procedural default problem, is what we don't have here that we would have had in front of the trial court had this issue been raised then is the victim. And the question, you know, Petitioner had two defenses. One was that she was, in fact, able to consent. The other was that, gosh, there's no way I could have known that she wasn't able to consent. Those are two different things that go to two different, one goes to her ability, one goes to his perception. It's like saying, well, gee, you know, rape one to have sex with someone under 12, but I thought she was 15. You know, those are two different concepts. I guess I have a little time. You'll have five or six minutes because you're a plaintiff. Thank you. But what we have here now at this point, we don't have the luxury, as I said in the brief, that the jury had, that the court had, that the defendant had at the time of what this, how this victim. The government's ultimate position is that if this very same person with the very same ability to consent had a, something that the government thought looked like a longer term happier relationship with somebody and was having sex, at least he wouldn't be prosecuted and maybe the statute wouldn't apply to him. I disagree with that. I disagree with that. And because it goes back to this whole concept, all of the prosecutor's comments, if you read the whole piece of that discussion, she is, and I think talking about, she keeps referring to this New Jersey case that nobody else in the room seemed to know what she was talking about, that we now recognize that mentally retarded people have the right to do things that previously nobody ever thought they had. And that's, it's really more of a free-flowing sort of discussion. She never took the position that, no, we would never prosecute one of these other people. Now, as a practical matter, they're probably not going to prosecute because nobody's going to go to the police and complain, as happened here, that, you know, she comes home and says to her sister, the big man fucked me and then throws up in the sink. That's a little bit different. That's why this case came to the attention of the police. And, in fact, it took a whole week because the mother didn't think that she, the daughter, would even be able to talk about it or explain. She couldn't identify the man. The only reason it was brought to the police was a week later, she happened to be out with her mother and saw him and said, him, him, that's the one. And that's when they went to the police. And if they hadn't found Petitioner's DNA in her panties, we probably wouldn't even be here today. So I think, and this is an issue that was raised. Petitioner tried to challenge, I think, in the direct appeal, yes, in the direct appeal, he was arguing, he moved to dismiss the case based on the prosecutor's so-called judicial admissions that, in fact, the victim was able to consent. That was rejected by the trial court. It was rejected by the Oregon Court of Appeals, that there, in fact, had not been any judicial admission made. How was the issue of consent subpoenaed to the jury? Was it under instruction? Did the jury have to find whether there could be consent? It's one of the elements of the crime, whether she was able to consent, because it wouldn't be rape if she could consent. And I disagree also with the Petitioner's position that the jury found that she had consent. I haven't seen this particular instruction. Was it further defined, or did you say? My guess is that they were instructed in the language of the statute, because that's fairly typical. The jury instructions are in the excerpts of record, I think probably about Volume 3. I don't have the page numbers. But the entire transcript is there, so you have the court's instructions, too. I don't know how to explain the connection between incapable of consent and the definition of mental defect. I find it somewhat confusing. In other words, the statute says the victim is incapable of consent by reason of mental defect. It then defines mental defect as rendering a person incapable of appraising the nature of the conduct of the person. But how does that connect up? I mean, it's the notion that it's your understanding of the statute that if the person is incapable of appraising the nature of the conduct of the person, then she's incapable of consent. It doesn't really say that. Well, I think that follows. I don't see how they're not connected. In other words, it's a judgment issue. And maybe if you take my previous hypothetical about an innate problem. You may have a child who is perfectly capable of appraising the nature of the conduct of the person, but still can't consent because we've decided he doesn't have the judgment to make a decision whether to do this thing or not, even though he perfectly well understands it. So how does consent necessarily depend on whether she understands the nature of the conduct of the person? I think the two situations are the same, that the legislature has made a policy decision that someone who – and the reason for the age thing is – the age restriction is that we assume that children are not able to fully comprehend the consequences of having sex. And that's the same situation here when you say – that's what the definition is, that they're not capable of appraising the nature of their conduct. And that's what calendar tells us it means. They have to be able to understand not just the mechanics, not just that, as this victim said, sex is with the man on top and the woman on the bottom. They have to understand more than that. And that's the question for the jury then is, did this victim actually understand or not? And there's plenty of evidence in this record to show that she didn't. That's why I was really concerned with the jury instruction on that, because if you look at the statute just appraising the nature of the conduct of the person, the conduct of the person is obviously what happens in that delinquent case. If she understands the conduct – Well, it's not that. It's appraising the nature of the conduct. I'm sorry. Appraising about the consequences there in the statute at all. But that's where the nature of the conduct comes in. And that's what calendar says. Nature doesn't mean just what you're doing. The nature of the conduct involves the – it includes an ability to contemplate and assess the right or wrong and the moral quality of the conduct. And that's what calendar says it means. And I don't – I can't – I'm sorry. I can't answer your question about exactly how they were instructed. We can check that. But thank you very much for your argument. Thank you. I appreciate it. We'll have one minute, really, just one. I'll try to make three points very briefly. I think your last question really gets at the vagueness that I'm trying to point out to the Court, because the statute is infused with this nature of we're going to assess the moral quality of these people's sexual relations. In regard to the instructions, the instructions to the jury merely track the statutory language that we've been discussing in some detail. Simply one quick point on the rape shield issue. A critical point that was kept from the jury was the therapist, Lou Garner's testimony, who the mother took the girl to earlier on to address her more appropriate direction of her sexual energies, that the mother denied that during her testimony. I actually fail to see what that has to do with the questions in this case, or any of the evidence that was excluded, because all of her sexual conduct may have been non-consensual in the sense that the statute talks about consent. So the fact that she was doing a lot of it just doesn't seem to have anything to do with whether she was able to consent or did consent. And I think when we look at something as, I would say, amorphous as understanding the nature of your sexual conduct, the sphere and type of sexual conduct that you've had does come in. And that's why, under the peculiar circumstances of this case, the rape shield ruling was wrong. And, for instance, this testimony from the counselor she'd gone to should have been for the jury as well, and could have well made a difference in this very, what was really a very close case where many charges were rejected. Thank you very much. The United States v. Masaryk is a case on as-applied vagueness challenges that talks about how you have to do the facts of that case. It's cited in, I think, page 7 or 8, if my memory is correct. Thank you very much. And thank both of you. The case of Anderson v. Morrow is submitted. We will have one more case, and then after that we'll have a break. The last case before the break will be United States v. Flowers. Thank you. May it please the Court. Laura Grace representing Mr. Flowers, the defendant appellant in this case. I didn't arrive here today with a lot of material to add to my brief. I'm satisfied that I made my argument in my brief. Under the particular factual circumstances of this case, the government took an inconsistent position. I'm not here to say that this Court should be, and saying that there's automatic standing. I'm saying that under the particular factual permutations in this particular case. I'm not correct in my understanding that there were two different routes by which the district court reached the same sentencing level, so that the two issues you raise are redundant, i.e., if you lose either one of them, you end up in the same place. That's right, that I have to lose both. And win both. And, yes, he's a level 34 either because he's a career appellant. And I'm also correct in understanding that you're only raising the sentencing issue. Yes, the motion to suppress is caught up in the sentencing issue, but I'm here on that. But you're not raising a challenge to the motion to suppress with regard to the conviction. That's right. All right, so essentially you have to win on both grounds. Yes. Okay. And the two points is that the he got to be a level 34 because of the amount of cocaine, and my argument is that the government took one tack at the motion to suppress and say that saying that he I don't have to lose the second issue, whatever's true of the first. That is the intervening arrest problem. I'll address that at the court once we do. Okay. There is no case that is expressly on point that deals with the straddle issue and addresses ex post facto. What I'm saying, what was raised below, and I'm saying here on appeal, is that it's an ex post facto problem. At the time of the 1989 events, which we're saying was one, he had one relationship, and it was one event that took place over six weeks, that the time to measure whether that's one event or two was at the time that that happened, those two crimes that were one event in 89, rather than measuring now at the time of But isn't all the ex post facto law clear that when you're talking about priors, you're talking about the effect of the crime of conviction? What was true at the time of the crime of conviction with regard to priors? How you count them, if you count them, anything about them? There's no case squarely on this point from the Ninth Circuit, from any circuit that I'm aware of. My argument is that under these circumstances, you characterize them at the time, which is in 1989. Why would you characterize them any differently than you would if the particular crime wasn't considered a prior at all at that point, but later on it was? You would characterize it at the time that it happened, then. But isn't the law clear that generally you don't do that? Isn't it generally true that if somebody is being convicted now, at the time he committed an earlier crime, it would not have counted as a prior conviction for his later crime, but now it did? Isn't there a myriad of laws that says that's not an ex post facto problem? Because notice issues are regarded the crime of conviction, not the earlier crime. I'm not sure I'm completely following that. That's my argument that I'm, you know, that was made at the trial court level I'm making now is that you characterize them in 1989. Because that's the time that he did those, and that's the sanction that should be attached at that point. Why do you do that? If the crime for which he is being sentenced, we're applying the guidelines at the time of the sentence, why would you go back and apply the guidelines to the prior sentence? It's the commentary at 89. Your Honor, that's my argument, that we look at 1989, and I've found no case. So you're telling us you don't really believe this argument. You're not even making it, in fact. I've made it to the best of my ability in my brief, and I'm doing my best now to make it an oral argument. It was raised below by a commentator. That's commentary, I think. Which commentary is it you're referring to? The commentary, the pivotal commentary changed in November of 1991, that the change is that an intervening arrest. This incident that we characterize at the trial court level as being one incident that took place in both February and March had an intervening arrest. He was arrested, went to jail, got out, and did the second half of the incident. And that would preclude it under current law. After November of 1991, that would be counted as two incidents. If the Court has no further questions. Thank you. You have about four minutes before I use anything. Yes, thank you. May it please the Court. My name is Richard Scruggs. I represent the United States in this appeal. The dispositive issue in this appeal is simply which guidelines apply to those prior convictions. There are three cases that are relevant, and they explain how the issue is disposed of quite simply by applying the rule. Guidelines apply according to, first, the date of sentencing, and if that presents an ex post facto problem, the date of the commission of the offense for which the person is being sentenced. And I cite the guideline sections in my brief. I also rely on Gallegos v. Gonzalez and contrast it with the two cases that the defendant relies on, Lindholm and Bishop. It takes a very careful reading of those cases because the issue there didn't get to the point about trying to apply guidelines from a period prior to the sentencing or the commission of the offense for which the sentence is being imposed. In each of those instances, the guidelines applied were the guidelines in effect either at the time of the commission of the offense being sentenced or at the time of the sentencing for that offense. In Lindholm, for example, at footnote three, page 281, the court notes the dates of the offenses as being three different dates for the bankruptcy fraud in that case. The last date occurring on June 3, 1991. June 3, 1991 was a few months before November 1, 1991, when the guidelines were amended, and therefore the earlier guidelines applied. In Bishop, the court used a phrase that wasn't precisely identifying an offense they were talking about. They said, at the time of Bishop's present offense, the commentary to this section stated and quoted the guideline section pre-amendment. The date of the present offense, while it's not specifically identified by date, is clear from that sentence to be saying the guideline in effect at the time of the commission of the offense was the pre-amendment guideline. And for those reasons, those two cases resolved without the intervening testimony. In Gallegos, in a footnote, and I quoted my brief so I won't reiterate it here, but I emphasize that Gallegos clearly dealt with a case where the offense was committed in December of 1991, about a month and a half after the amendment came into effect, and therefore the intervening exception applied.  There are alternative grounds for the result reached, and that supports the decision. Would it make absolutely no difference to the defendant whether he was found to have reached the sentencing level because of relevant conduct or because of these earlier convictions? Would it not matter? Could it matter for any purpose? Could it matter for his treatment in prison? Could it matter for any later priors he may have or any other reason? The career offender route had a significance, a major significance, and that was the criminal history category became six rather than three. I understand that, but what I'm asking you is, as I understand it, the district judge reached the 34 level by these two routes. Yes, Your Honor. If we were to affirm on only one ground and not reach the other, would we be deserving the defendant because it might matter to him on which ground the 34 was reached? I'm not aware of any distinction in a consequence occurring because of which route is taken, and, frankly, I don't concede the first or the other route. It was invalid. No, I understand that, but I'm talking in terms of decision-making, three, whether we need to reach both. Perhaps counsel could identify one, Your Honor. It didn't come up in any of the litigation below, and your question is an obvious one, of course. I guess my view, as I looked at it, was under either route the judge was right, and so I didn't see that there was certainly a difference in which route you took mattered. That would be a consideration if you only went to one basis in this opinion. Okay. But my understanding is that pre-sentence reports, for example, and this kind of information might be used with regard to how he was treated while in prison. So would it matter whether he was designated a career offender or not designated a career offender? I believe that sentencing the judge specifically in granting a downward departure from the career offender criminal history made note of the fact that his record, while technically qualifying him as a career offender, warranted mitigation of his sentence, and that was done for what benefit it might have in his placement later. So that record exists in the judge's findings in granting that downward departure in the criminal history category. Which one of the two routes was the one that walked him into the career offender? Was the intervening arrest problem? Yes, Your Honor. Not the other one? Not the relevant conduct. So the harsher one, if there were a harsher one, would be the intervening arrest one? That's the one that results in the career offender characterization. Okay. If you have nothing further? I rely on my brief for the rest, Your Honor. Thank you. Okay. Thank you very much. We'll give you one minute in rebuttal. Dean, can you answer my question as to whether it makes a difference? I don't believe that it does. Because he is subject to deportation, I think as a practical matter, that probably is the fact that it has the most effect on his conditions of his confinement. I'm sorry? I think the fact that he's deportable has the most effect on the conditions of his confinement, not whether he is a career offender or because of the amount. I see. And neither one of these makes him more or less deportable. It doesn't matter. Not that I know of. Okay. Thank you. We're going to take a 15-minute break, and we will return in for the rest of the panel. Thank you.
judges: Goodwin, Hug, Berzon